**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KATRINA SAYLES, KEN McDOWELL, CHRIS SMITH, ROBERT GATES and CORNELIA GREER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>McDONALD'S CORPORATION, a Delaware corporation; McDONALD'S USA, LLC, a Delaware limited liability company; and DELOITTE CONSULTING LLP, a Delaware limited liability partnership,<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiffs Katrina Sayles, Ken McDowell, Chris Smith, Robert Gates and Cornelia Greer ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendants McDonald's Corporation and McDonald's USA, LLC (together, "McDonald's") and Deloitte Consulting LLP ("Deloitte," and with McDonald's, "Defendants"). Plaintiffs sue under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1; under California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, including its prohibitions on using, distributing, and coercing adherence to a common pricing algorithm, *id.* § 16729; and under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.* Plaintiffs allege the following based on personal knowledge as to their own acts and on information and belief as to all other matters, based on investigation of counsel.

## NATURE OF THE ACTION

1. For generations, American consumers have counted on McDonald's for familiar meals at affordable prices. Families stretching limited budgets have made McDonald's part of their everyday lives. This case is about how McDonald's exploits that trust to extract more money from its loyal customers.

2. Since at least 2019, McDonald's has organized a pricing scheme that pools confidential sales data from its independently owned franchisees and uses that information to coordinate the prices customers pay. Enlisting outside consultants and an offshore technology firm to carry out its scheme, McDonald's has turned millions of ordinary purchases into inputs in a common pricing system that McDonald's designs, controls, and runs from its Chicago headquarters that calculates how much more money customers will tolerate paying for its food (the McDonald's "Pricing System").

3. McDonald's Pricing System is a common pricing algorithm. Every McDonald's restaurant must send McDonald's its confidential, granular, transaction-level point-of-sale data, including the items purchased, quantities sold, prices charged, discounts applied, and the dates, times and locations of sales. The Pricing System pools that data and uses the combined confidential data to recommend prices item-by-item for each restaurant. According to public reports, the Pricing System recommends raising the price of an item after 30% of restaurants have raised an item's price.[1]

4. McDonald's pressures its franchisees to adhere to the Pricing System and it reportedly records each franchisee's deviations from the System's recommendations. McDonald's

---

[1] Waylon Cunningham, *Inside McDonald's Push to Have AI Price Your Big Mac*, REUTERS (Sept. 29, 2026), https://www.reuters.com/business/inside-mcdonalds-push-have-ai-price-your-big-mac-2026-09-29/ (last visited Nov. 16, 2026).

National Franchising Standards reportedly require franchisees to be "constructively engaging with McDonald's approved Pricing Consultant and Tools."[2] Its CEO told investors in August 2026 that "pricing non-compliance" is part of the Business Reviews that govern franchisees' "growth and eligibility."[3]

5. Prices rose dramatically after McDonald's implemented the Pricing System. From 2019 through 2024, McDonald's raised its average menu price by about 40 percent,4 nearly double the 22.7 per cent rise in the Consumer Price Index ("CPI")5 and well above the 33 percent rise in BLS's index for limited service (fast food meals).6

6. Lawmakers have raised concerns. On November 2, 2026, Senator Elizabeth Warren and four Members of Congress wrote McDonald's Chief Executive Officer that "its AI pricing tools may facilitate collusion between franchisees who should be operating as competitors," and that "pressuring competing franchisees to use a shared AI pricing tool built on nonpublic data is not a standard business practice, but rather a potential antitrust issue."[7] They asked McDonald's to

---

[2] *Id.*

[3] *McDonald's (MCD) Q2 2026 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Aug. 4, 2026), https://stockanalysis.com/stocks/mcd/transcripts/662377-q2-2026/ (last visited Nov. 16, 2026).

[4] *U.S. Pricing: Myths vs. Facts*, MCDONALD'S (May 29, 2024), https://corporate.mcdonalds.com/content/dam/sites/corp/nfl/pdf/McDUS%20Pricing%20Myths%20vs%20Facts%20052924.pdf (last visited Nov. 16, 2026) ("The average price of McDonald's menu items is up ~40% over the past five years.").

[5] *Consumer Price Index for All Urban Consumers (CPI-U): All Items in U.S. City Average, Not Seasonally Adjusted, Series CUUR0000SA0*, U.S. BUREAU OF LABOR STATISTICS, https://data.bls.gov/timeseries/CUUR0000SA0 (last visited Nov. 16, 2026) (annual average index of 255.657 for 2019 and 313.689 for 2024, an increase of 22.7 percent).

[6] *Consumer Price Index for All Urban Consumers (CPI-U): Limited Service Meals and Snacks in U.S. City Average, Not Seasonally Adjusted, Series CUUR0000SEFV02*, U.S. BUREAU OF LABOR STATISTICS, https://data.bls.gov/timeseries/CUUR0000SEFV02 (last visited Nov. 16, 2026) (annual average index of 182.053 for 2019 and 242.913 for 2024, an increase of 33.4 percent).

[7] Letter from Sen. Elizabeth Warren, Rep. Becca Balint, Rep. Greg Casar, Rep. Jesús G. "Chuy" García & Rep. Mary Gay Scanlon to Chris Kempczinski, President & CEO, McDonald's (Nov. 2, 2026), https://www.warren.senate.gov/wp-content/uploads/2026/11/11.2.2026-Letter-to-McDonalds-on-AI-Pricing-Tool.pdf, at 1 (last visited Nov. 16, 2026) [hereinafter *Warren Letter*].

answer sixteen questions by November 16, 2026, including what antitrust review it conducted before deploying the tools.[8]

7. Federal and California law prohibit McDonald's from collecting and disseminating competitively sensitive pricing information among its independently owned franchisees to coordinate prices and suppress competition. Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits agreements among competitors to fix prices or otherwise restrain competition, including through common pricing algorithms. McDonald's cannot evade these prohibitions by using a centralized algorithm to accomplish what its franchisees could not lawfully agree to do directly.

8. California has addressed this conduct even more directly. Effective January 1, 2026, the Cartwright Act expressly prohibits the use or distribution of common pricing algorithms as part of a price-fixing conspiracy and certain coercive practices involving algorithmic pricing recommendations. Cal. Bus. & Prof. Code § 16729. As the legislation's sponsor explained, "digital collusion is just as damaging as handshake deals behind closed doors." That is precisely the conduct alleged here. McDonald's uses a common pricing algorithm to coordinate prices among competing restaurants and pressures franchisees to adopt its recommendations rather than set prices independently.

9. McDonald's has orchestrated a horizontal, hub-and-spoke price-fixing conspiracy among competing McDonald's restaurants. McDonald's serves as the hub collecting and pooling competitively sensitive information, generating coordinated pricing recommendations, and, through its company-owned restaurants, a direct competitor of the franchisees. The franchisees are the spokes, supposedly competing restaurants whose independent pricing decisions are displaced

[8] *Id.* at 4-5.

by McDonald's centralized system. This is unlawful *per se* under the Sherman Act and the Cartwright Act.

10. Plaintiffs bring this action on behalf of themselves and a nationwide class of McDonald's customers under federal antitrust law, and a California subclass under California law. They seek treble damages for the supracompetitive prices they paid as a result of McDonald's price-fixing conspiracy, together with injunctive relief to restore independent pricing and competition among McDonald's restaurants.

## JURISDICTION AND VENUE

11. This action is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, costs of suit, and reasonable attorneys' fees for injuries caused by Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and to enjoin further violations. This Court has subject-matter jurisdiction over those claims under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 26.

12. This Court has supplemental jurisdiction over Plaintiffs' Cartwright Act and other California law claims under 28 U.S.C. § 1367(a), because they arise from the same nucleus of operative fact as the Sherman Act claims. The Court independently has jurisdiction over the state-law claims under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class and Subclass each contain more than 100 members; and Plaintiffs, each a citizen of California, are diverse from McDonald's Corporation, a citizen of Delaware and Illinois.

13. This Court has personal jurisdiction over each Defendant. McDonald's Corporation and McDonald's USA, LLC maintain their principal places of business in Chicago, Illinois. Deloitte transacts business in this District and, on information and belief, works in Chicago to

provide pricing strategy and consulting services to McDonald's in connection with the challenged Pricing System. Personal jurisdiction over the Defendants is also proper under Section 12 of the Clayton Act, 15 U.S.C. § 22, which authorizes nationwide service of process in federal antitrust actions against corporations.

14. Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b)(1), (b)(2), and (c). McDonald's resides, is found, and transacts business here. A substantial part of the events giving rise to the claims occurred in this District. McDonald's designed the McDonald's Pricing System, set its rules and corporate pricing targets, received and pooled restaurants' transaction data, adopted the January 2026 pricing-engagement standard, conducted the Business Reviews that enforce it, and made the public statements described below, from its Chicago headquarters. McDonald's standard franchise agreement selects Illinois law and directs notices to McDonald's headquarters in this District.

15. Four related putative class actions challenging McDonald's Pricing System under the Sherman Act are pending in this District: *Thomas v. McDonald's USA, LLC*, No. 1:26-cv-12149 (N.D. Ill. filed Oct. 2, 2026); *Rossi v. McDonald's Corp.*, No. 1:26-cv-12651 (N.D. Ill. filed Oct. 15, 2026); *Worthington v. McDonald's USA, LLC*, No. 1:26-cv-13243 (N.D. Ill. filed Oct. 27, 2026); and *Allaire v. McDonald's Corp.*, No. 1:26-cv-13634 (N.D. Ill. filed Nov. 3, 2026). Unlike those actions, this case also asserts claims under California law on behalf of a California subclass.

16. Defendants' conduct occurred in, and substantially affected, interstate commerce, including commerce within California. McDonald's operates restaurants nationwide, including more than 1,200 restaurants in California.

## PARTIES

### A. Plaintiffs

17. Plaintiff Katrina Sayles is a citizen of California residing in Elk Grove, California. Ms. Sayles has been a regular McDonald's customer for decades, frequently dining there with her family, including her daughters and grandchildren. During the Class Period, Ms. Sayles regularly purchased McDonald's menu items at California restaurants, including locations on Laguna Boulevard in Elk Grove, paying in person. As a result of Defendants' anticompetitive conduct, Ms. Sayles paid supracompetitive prices for these purchases.

18. Plaintiff Ken McDowell is a citizen of California residing in San Rafael, California. A lifelong McDonald's customer, Mr. McDowell purchased menu items approximately once a week during the Class Period at the McDonald's restaurant at 2114 4th Street, San Rafael, California, near his home, paying in person, often with cash. As a result of Defendants' anticompetitive conduct, Mr. McDowell paid supracompetitive prices for these purchases.

19. Plaintiff Chris Smith is a citizen of California residing in San Ramon, California. A lifelong McDonald's customer, Mr. Smith routinely purchased menu items for his family during the Class Period at the McDonald's restaurants located at 2481 San Ramon Valley Boulevard and 21001 San Ramon Valley Boulevard. As a result of Defendants' anticompetitive conduct, Mr. Smith paid supracompetitive prices for these purchases.

20. Plaintiff Robert Gates is a citizen of California residing in San Francisco, California. A McDonald's customer for approximately 30 years, Mr. Gates purchased menu item, primarily breakfast items, during the Class Period at the McDonald's restaurant located at 302 Potrero Avenue, San Francisco, California, near his home, usually once or twice a week, including in person at the restaurant. As a result of Defendants' anticompetitive conduct, Mr. Gates paid supracompetitive prices for these purchases

21. Plaintiff Cornelia Greer is a citizen of Illinois residing in Chicago, Illinois. During the Class Period, Plaintiff Greer purchased McDonald's menu items for herself and her family at restaurants throughout the Chicagoland area. As a result of Defendants' anticompetitive conduct, Ms. Greer paid anticompetitive prices for these purchases.

**B. Defendants**

22. Defendant McDonald's Corporation is a Delaware corporation with its principal place of business at 110 North Carpenter Street, Chicago, Illinois 60607. It is the parent of McDonald's USA, LLC and of the subsidiaries that own and operate McDonald's company-owned U.S. restaurants ("McOpCo" restaurants). Its officers, including Chairman and CEO Christopher Kempczinski and Chief Financial Officers Kevin Ozan and Ian Borden, made the statements about the McDonald's Pricing System described below.

23. Defendant McDonald's USA, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois, and a wholly owned subsidiary of McDonald's Corporation. It is the franchisor under current U.S. franchise agreements, issues McDonald's Franchise Disclosure Document ("FDD"), administers the National Franchising Standards and Business Reviews, and charges franchisees a fee for "the use of the Base Pricing Engine."

24. Through the McOpCo restaurants, including McOpCo restaurants in California, McDonald's sells menu items to consumers in competition with franchised restaurants. McDonald's is therefore both the organizer of the conspiracy and a horizontal competitor of the franchisees that participate in it.

25. Defendant Deloitte Consulting LLP is a Delaware limited liability partnership headquartered in New York, New York. On information and belief, Deloitte developed and operates the "McDonald's Pricing Analyzer," the franchisee-facing interface of the McDonald's Pricing System, and employs "Pricing Advisors" who deliver the system's recommendations to

competing McDonald's restaurants. Deloitte participated in the conspiracy as an independent co-conspirator.

**C. Co-Conspirators**

26. The co-conspirators include all U.S. McDonald's franchisees, including those operating restaurants in California; the McOpCo subsidiaries; and Tiger Analytics, Inc., which, according to Reuters, runs McDonald's pricing engine under rules and targets that McDonald's supplies. Each franchisee knowingly joined the conspiracy by agreeing to supply its data and adhere to the McDonald's Pricing System, knowing that its competitors were doing the same. Plaintiffs reserve the right to name additional co-conspirators, including California franchisees, as defendants. Each Defendant is jointly and severally liable for the acts of its co-conspirators in furtherance of the conspiracy.

## FACTUAL ALLEGATIONS

**A. McDonald's Restaurants Are Independent Competitors by Design**

27. McDonald's profits when its franchisees raise menu prices. It collects royalties of approximately 4-5% of each franchised restaurant's gross sales, along with rent and other fees, while retaining all sales revenue from its company-owned and operated McOpCo restaurants.[9] McDonald's therefore has a direct financial incentive to increase menu prices, provided that higher prices do not reduce sales sufficiently to offset the increases. According to a franchisee complaint, McDonald's also owns or leases the real estate at many franchised locations and charges rent "usually based on an agreed percentage of sales," a percentage determined by McDonald's for each location.[10]

---

[9] *The Financials*, MCDONALD'S, https://www.mcdonalds.com/ca/en-ca/about-us/franchising/the-financials.html (last visited Nov. 16, 2026).

[10] First Am. Compl., *Michell v. McDonald's Corp.*, No. 1:24-cv-03442, (E.D.N.Y. Nov. 1, 2024), ECF No. 55, ¶ 24.

28. McDonald's franchisees are separately owned businesses, legally independent of McDonald's and one another. McDonald's franchise agreement provides that the franchisee is an "independent contractor" with "no authority, express or implied, to act as agent of McDonald's or any of its affiliates for any purpose."[11] Absent McDonald's anticompetitive pricing scheme, these independently owned restaurants would make their own pricing decisions and compete with one another for customers, including on price.

29. McDonald's expressly acknowledges that its franchisees compete with one another and with McOpCo restaurants. Its franchise agreements grant no exclusive territories, and its FDD warns franchisees that they "may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."12 McDonald's told the Federal Trade Commission in a 2023 public comment that its structure incentivizes franchisees to maintain high-quality restaurants to avoid losing customers to nearby McDonald's locations.13

30. McDonald's also publicly represents that its franchisees independently determine their menu prices. On May 24, 2024, responding to widespread criticism and reports of sharply rising menu prices, McDonald's USA's President Joe Erlinger defended the company's pricing practices by emphasizing that franchisees "set menu prices for their restaurants."14 At its September 2026 Investor Day, McDonald's Global Chief Marketing Officer said that

[11] Compl., *Thomas v. McDonald's USA, LLC*, No. 1:26-cv-12149 (N.D. Ill. Oct. 2, 2026), ECF No. 1, ¶ 32.
[12] *Id.*, ¶ 32.
[13] *Id.*, ¶ 38 (quoting Letter from McDonald's to FTC Chair Lina Khan and FTC Commissioners Rebecca Slaughter and Alvaro Bedoya Re: Public Comment on Provisions of Franchise Agreements and Franchisor Business Practices (Oct. 24, 2024)).
[14] *Providing Meaningful Value to Our Fans, With a Side of Facts*, MCDONALD'S (May 29, 2024), https://corporate.mcdonalds.com/corpmcd/our-stories/article/providing-meaningful-value-to-our-fans-with-a-side-of-facts.html (last visited Nov. 16, 2026).

"[f]ranchisees retain control over independent pricing decisions."[15] These public assurances stand in stark contrast to McDonald's actual practices of pooling franchisees' confidential sales data, generating centralized pricing targets, and pressuring franchisees to adhere to them.

31. Absent the conspiracy, each independently owned franchisee and each company-operated restaurant would independently determine its menu prices based on its own costs, customer demand, and competition from nearby restaurants, including other McDonald's locations.

**B. Under McDonald's Earlier Decentralized Pricing Practices, Prices Tracked Costs**

32. Historically, McDonald's menu prices generally tracked increases in operating costs and inflation. In the first quarter of 2019, McDonald's reported that U.S. menu prices had risen "about 2%" compared with an increase of "approximately 3%" in commodity costs. In the and third-quarter, U.S. menu prices rose "nearly 3%" while commodity costs rose "about 2%."16

33. At that time, McDonald's pricing functions were decentralized. At its 2026 Investor Day, McDonald's CEO acknowledged that before McDonald's restructured, "pricing analytics" and other business functions "were all decentralized," and that before 2019 McDonald's "didn't have [a] revenue growth management function."17

34. McDonald's franchise disclosures reflect the evolution of its pricing practices from decentralized to centralized. Before 2025, McDonald's did not charge franchisees a fee "for the use of the Base Pricing Engine."18

[15] *McDonald's (MCD) Transcript: Investor Day 2026*, STOCKANALYSIS.COM (Sept. 23, 2026), https://stockanalysis.com/stocks/mcd/transcripts/746101-investor-day-2026/ (last visited Nov. 16, 2026).
[16] Compl., *Rossi v. McDonald's Corp.*, No. 1:26-cv-12651 (N.D. Ill. Oct. 15, 2026), ECF No. 1, ¶ 28.
[17] *Id.*, ¶ 31.
[18] *Id.*, ¶ 32.

35. Franchisees saw the change coming. In October 2018, a franchisee warned that "[t]he next control change will be the transfer of Menu Board Pricing to Deloitte and Touche," and that "[o]ur ability to price our menu boards may be one of the last controls we still have."[19] By April 2019, franchisees were using the "McDonald's Pricing Analyzer" to set menu-board prices. Reuters reports that McDonald's "has used some form of an AI pricing tool since at least 2019."[20]

### C. McDonald's Now Requires Competing Restaurants to Share Their Confidential Sales and Pricing Data

36. McDonald's requires its franchisees to provide it with confidential, transaction-level point-of-sale ("POS") data, including detailed information about individual sales transactions. As McDonald's FDD explains: "The restaurant's transaction-level information generated by the POS, including sales, transactions, and product mix information, is stored on your server hardware and transmitted to McDonald's and held on its servers. McDonald's has independent access to this information and there are no contractual limits on its right to access such information."[21] The same is true of mobile-app orders. Franchisees also submit monthly restaurant profit-and-loss statements.

37. McDonald's thus possesses each competing restaurant's confidential, nonpublic pricing and sales information, including prices charged, unit sales, product mix, costs, and margins. The McDonald's Pricing System pools this competitively sensitive information and uses it to generate pricing recommendations for competing restaurants. The Pricing System therefore enables one restaurant's confidential business information to influence the prices charged by its competitors, replacing independent pricing decisions with coordinated recommendations.

---

[19] *Id.*

[20] *Id.*, ¶ 33.

[21] Compl., *Worthington v. McDonald's USA, LLC*, No. 1:26-cv-13243 (N.D. Ill. Oct. 27, 2026), ECF No. 1, ¶ 56.

### D. McDonald's Pools Competitors' Confidential Data to Generate Coordinated Pricing Recommendations

38. At its September 2026 Investor Day, McDonald's described its "menu pricing engine" as "an industry-leading tool" that provides franchisees "pricing recommendations down to the restaurant and item level," "[i]nformed by insights from millions of transactions and a broad range of market data."[22] A McDonald's executive described the tool as "only as good as the data feeding it," drawn from a "standard restaurant data lake" capturing "billions of data points daily."[23]

39. According to Reuters, which reviewed August 2026 screenshots of the Pricing System's franchisee interface, McDonald's uses machine-learning algorithms to analyze data from millions of daily transactions across McDonald's restaurants and generates what McDonald's calls "the optimal price" for each menu item at each location.[24] McDonald's issues pricing guidance at least three times a year.[25] McDonald's CEO told investors that as more customers join McDonald's digital ecosystem, "our pricing tools get sharper, our AI models get smarter."[26]

40. McDonald's controls the rules and corporate pricing targets that govern the engine's recommendations for competing restaurants. According to Reuters, those rules include: (a) targeting increases on items that have not had price increases in the last two years; (b) recommending price increases once at least 30% of restaurants have already raised the price of that item (the "30% Rule"); and (c) excluding ice cream and drinks from increases in summer

---

[22] *McDonald's (MCD) Transcript: Investor Day 2026*, *supra* note 15.
[23] *Id.*
[24] Cunningham, *supra* note 1.
[25] *See id.*
[26] *McDonald's (MCD) Transcript: Investor Update*, STOCKANALYSIS.COM (Dec. 6, 2023), https://stockanalysis.com/stocks/mcd/transcripts/146823-investor-update/ (last visited Nov. 16, 2026).

months.27 Reuters also reports that the Pricing System "recommended large price increases during the pandemic and afterwards."28

41. The 30% Rule illustrates how McDonald's uses competing restaurants' pricing decisions to coordinate future price increases. Under the rule, once 30% of restaurants raise the price of a menu item, the Pricing System recommends that other restaurants follow suit. Thus, price increases by one group of restaurants become the basis for recommending increases to their competitors. Rather than independently determining prices based on their own costs and market conditions, competing franchises receive coordinated recommendations informed by one another's pricing decisions. The 30% Rule thereby creates a mechanism for spreading price increases across competing McDonald's restaurants.

42. The system also estimates how large an increase each restaurant's customers will tolerate. According to Reuters, the franchisee interface measures "customer willingness to pay in your area" and warns franchisees when prices are too low.29 It identifies opportunities for price increases, displaying assessments such as: "[y]our restaurant is showing MEDIUM SENSITIVITY to Price."30 In a competitive market, that tolerance would be limited by the prices of nearby competing restaurants, including other McDonald's restaurants. Because McDonald's uses the same pool of confidential transaction data to generate pricing recommendations for those competing restaurants, the system undermines the independent price competition that would otherwise constrain price increases.

43. McDonald's recognizes the antitrust risks inherent in its Pricing System. According to screenshots published by Reuters, the pricing portal's terms of service warn that users "may be

[27] *See* Cunningham, *supra* note 1.
[28] *Id.*
[29] *Id.*
[30] *Id.*

competitors of each other," so that "it is particularly important for all Users of the Tool to understand and comply fully with anti-trust and competition laws."31 Former FTC Commissioner William Kovacic told Reuters that the disclaimer was "an acknowledgment there's a potential problem."32

44. Courts in this District have sustained Sherman Act claims where competitors priced through a common intermediary that pooled their confidential data. See In re MultiPlan Health Ins. Provider Litig., 789 F. Supp. 3d 614 (N.D. Ill. 2025) (hub-and-spoke agreement among payors using a common pricing service). The McDonald's Pricing System is unlike the software at issue in Gibson v. Cendyn Group, LLC, 148 F.4th 1069 (9th Cir. 2025), where the plaintiffs failed to allege that the third-party software vendor pooled competitors' confidential pricing information in generating recommendations for other competitors. Here, McDonald's system collects and pools each restaurant's confidential transaction-level data to generate its competitors' prices, and the 30% Rule makes each restaurant's recommendation depend expressly on its competitors' pricing.

## E. McDonald's and its Competing Franchises Rely on the Same Pricing System

45. McDonald's executives have repeatedly confirmed that the company and its competing franchisees rely on the same pricing advisors and tool:

1. In October 2021, CEO Christopher Kempczinski stated: "Both we and our franchisees, over the last couple of years, have been using a third party for pricing advisory services."[33]

[31] *Id.*
[32] *Id.*
[33] *McDonald's (MCD) Q3 2021 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Oct. 27, 2021), https://stockanalysis.com/stocks/mcd/transcripts/9055-q3-2021/ (last visited Nov. 16, 2026).

2. McDonald's former CFO Kevin Ozan confirmed: "[w]e use a third-party adviser that advises the franchisees as well as the company on pricing."[34]

3. In October 2023, CFO Ian Borden acknowledged that McDonald's works with advisers "who obviously make pricing recommendations to our business, including our franchisees."[35]

4. In December 2023, McDonald's explained: "When we follow our pricing tools, our ability to price at a level that the consumer will accept is significantly better than when we don't . . .. Franchisees see the value in this and adoption rates for our pricing strategy are high."[36]

46. These statements confirm that McDonald's controls the system centrally and its independently owned franchisees rely on common pricing advice and follow the pricing strategy.

47. McDonald's centrally directs and integrates these pricing capabilities. At its 2026 Investor Day, McDonald's CEO described restructuring "pricing analytics" into "one McDonald's way of operating" built on "a single enterprise data foundation."37 In August 2026, he told investors McDonald's was "close to having all our major markets on . . . one pricing engine."38

**F. Deloitte Operates the Franchisee-Facing Layer of the System**

48. In February 2020, Deloitte promoted a restaurant "Strategic Pricing Analyzer" "developed with one of the world's leading restaurants," which it described as combining point-of-sale, economic, and competitive data, applying business rules supplied by the restaurant,

[34] *McDonald's (MCD) Q2 2022 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (July 26, 2022), https://stockanalysis.com/stocks/mcd/transcripts/26845-q2-2022/ (last visited Nov. 16, 2026).
[35] *McDonald's (MCD) Q3 2023 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Oct. 30, 2023), https://stockanalysis.com/stocks/mcd/transcripts/85502-q3-2023/ (last visited Nov. 16, 2026).
[36] *McDonald's (MCD) Transcript: Investor Update*, *supra* note **Error! Bookmark not defined.**.
[37] *McDonald's (MCD) Transcript: Investor Day 2026*, *supra* note 15.
[38] *McDonald's (MCD) Q2 2026 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Aug. 4, 2026), https://stockanalysis.com/stocks/mcd/transcripts/662377-q2-2026/ (last visited Nov. 16, 2026).

delivering recommendations through an online portal, and being supported by in-market pricing advisors.39 Deloitte reported deploying the tool to several thousand restaurants. On information and belief, that chain is McDonald's and the tool is the "McDonald's Pricing Analyzer," whose login page bears both McDonald's Golden Arches and Deloitte's name.

49. Deloitte employs "Pricing Advisors" who serve as "the client's first point of contact to solve their pricing needs" within a "dedicated region."40 These advisors use "a custom-built pricing optimization solution" to "make appropriate recommendations," and "[p]resent pricing trends during regional client meetings (2-3x per year)."41 In February 2021, Reuters reported that "[m]any McDonald's franchisees turn to consulting firm Deloitte for advice on how to set optimal pricing," including a recommended price of $3.69 for McDonald's new chicken sandwiches.42

50. A McDonald's franchisee has alleged in federal court that McDonald's "recommends that its Owner/Operators use the price recommendation services of a nationally recognized firm (Deloitte) that McDonald's authorizes to use its registered Golden Arches trademark when communicating written price recommendations to Owner/Operators."43 That franchisee, George Michell, alleges that "[b]y January 31, 2023, Deloitte had recommended to Michell that he price his Big Mac combo meal at the Darien turnpike restaurant above $18.00"; that he charged that price "at Deloitte's recommendation for five months before it became the subject of media attention"; and that McDonald's "had ample notice" of the price, "had not complained," and "profited by collecting a service fee as a percentage of Michell's gross sales."44

---

[39] Compl., *Rossi*, No. 1:26-cv-12651, ECF No. 1, ¶ 39.
[40] *Id.,* ¶ 50.
[41] *Id.,* ¶ 32.
[42] Hillary Russ, *How McDonald's Plans to Bring Back Traffic with New Cheaper Chicken Sandwiches*, REUTERS (last updated Feb. 12, 2021), https://www.reuters.com/business/how-mcdonalds-plans-bring-back-traffic-with-new-cheaper-chicken-sandwiches-2021-02-12/ (last visited Nov. 16, 2026).
[43] First Am. Compl., *Michell*, No. 1:24-cv-03442, ECF No. 55, ¶ 48.
[44] *Id.*, ¶¶ 141-42.

51. On information and belief, Deloitte's regional meetings bring together competing franchisees in the same region, including in California, to receive the same pricing trends from the same Deloitte adviser. Since January 2026, McDonald's has required franchisees to engage with an "approved Pricing Consultant," which on information and belief, is Deloitte. Deloitte also had a direct financial incentive to increase menu prices because its compensation was tied to the incremental profit its pricing tool generated.[45] Deloitte thus stood to profit from the higher prices its recommendations produced. By knowingly using competing restaurant's pooled confidential data to generate and deliver pricing recommendations to those same competitors, Deloitte joined and furthered the price-fixing conspiracy.

### G. McDonald's Issues Recommendations in Coordinated "Pricing Rounds," and Restaurants Adhere

52. McDonald's coordinates periodic pricing rounds across its system in coordinated rounds. In June 2022, McDonald's head of Investor Relations explained that "it takes us probably 6 to 8 weeks to get a good read on how a pricing round goes before we can decide what we might do next," with increases a "few times a year."[46]

53. McDonald's executives repeatedly acknowledge widespread franchisees compliance with its pricing recommendations. In October 2022, McDonald's CFO told investors: "we're still seeing very strong adherence with our franchisees to our pricing recommendations."[47] In April 2023, McDonald's CEO said McDonald's had built the capability "to know exactly by item, by restaurant, the ability for us to take pricing. And what we see is that when we follow that

[45] Compl., *Rossi*, No. 1:26-cv-12651, ECF No. 1, ¶ 67.
[46] *Id.*, ¶ 54.
[47] *McDonald's (MCD) Q3 2022 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Oct. 27, 2022),https://stockanalysis.com/stocks/mcd/transcripts/27799-q3-2022/ (last visited Nov. 16, 2026).

. . . we're able to get the pricing that we need through," and the CFO praised "the discipline that both our owner-operators and our company restaurants are bringing" to pricing.[48]

**H. McDonald's Monitors Adherence and Coerces Compliance**

54. McDonald's monitors whether competing restaurants follow its recommended prices. According to Reuters, a June 2026 franchisee document shows that McDonald's "records franchisees' deviations from the recommendations" in detail.49 Five franchisees told Reuters that McDonald's pressured them to use its pricing tools, including through calls from corporate when they strayed from the recommendations.50 A retired franchisee said: "You don't really have much of a choice anymore."51

55. McDonald's also pressured individual franchisees over their pricing decisions. In February 2024, a McDonald's executive faulted a franchisee for "not utilizing industry-standard advisors when setting his retail prices."52 The franchisee alleges that he had used the Deloitte pricing service recommended by McDonald's and that his pricing was "consistent with Deloitte's advice."

56. McDonald's possesses substantial leverage over franchisees' continued operations and expansion. Franchisees "have no right to renew or extend" their franchise agreements.53 McDonald's assesses each franchisee at periodic Business Reviews under the National Franchising Standards, which determine whether a franchisee receives a new term and may acquire more

---

[48] *McDonald's (MCD) Q1 2023 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Apr. 25, 2023), https://stockanalysis.com/stocks/mcd/transcripts/51491-q1-2023/ (last visited Nov. 16, 2026).
[49] Cunningham, *supra* note 1.
[50] *See id.*
[51] *Id.*
[52] First Am. Compl., *Michell*, No. 1:24-cv-03442, ECF No. 55, ¶ 140.
[53] Compl., *Worthington*, No. 1:26-cv-13243, ECF No. 1, ¶ 66.

restaurants. The Franchise Agreement also requires adherence to "McDonald's standards and policies as they exist now and as they may be from time to time modified."[54]

57. In December 2025, McDonald's announced that, effective January 1, 2026, it would assess the outcomes of franchisees' pricing decisions, and that franchisees must be "constructively engaging with McDonald's approved Pricing Consultant and Tools."55 In a December 8, 2025 system message, Andrew Gregory, McDonald's Senior Vice President of Global Franchising, Development and Delivery, told franchisees that McDonald's would assess the outcomes of their pricing decisions "in relation to providing great value to our customers." According to Restaurant Business, which reviewed the message, McDonald's assesses each operator's use of the company's pricing tools, its work with pricing consultants, its support for system promotions, and its business performance.56

58. Franchisees understood the new standard to reach pricing that had been theirs to set. In a December 2025 message to its members, the National Owners Association, an independent association of McDonald's franchisees, were concerned that McDonald's was encroaching on pricing decisions previously reserved to them, writing that "[i]t is imperative that [owner/operators'] price independence continues."57

[54] *Id.*, ¶ 67.
[55] Cunningham, *supra* note 1.
[56] *See* Jonathan Maze, *McDonald's Is Making Value Part of Its Franchise Standards*, RESTAURANT BUSINESS (Dec. 8, 2025), https://www.restaurantbusinessonline.com/operations/mcdonalds-making-value-part-its-franchise-standards (last visited Nov. 16, 2026); *see also* Amelia Lucas, *McDonald's Will Assess If Franchisees Are Offering Value for Customers Under New Standards*, CNBC (Dec. 8, 2025), https://www.cnbc.com/2025/12/08/mcdonalds-value-franchising-standards.html (last visited Nov. 16, 2026); Cunningham, *supra* note 1.
[57] Jonathan Maze, *With Its New Value Standard, McDonald's Makes Another Big Change to Its Franchise Relationship*, RESTAURANT BUSINESS (Dec. 16, 2025), https://www.restaurantbusinessonline.com/financing/its-new-value-standard-mcdonalds-makes-another-big-change-its-franchise-relationship (last visited Nov. 16, 2026) (alteration in original).

59. On McDonald's August 4, 2026 earnings call, CEO Kempczinski confirmed that the company monitors pricing compliance: "we provide recommended guidance to our franchisees. We're quite clear in terms of what we believe is the right pricing execution."[58] He reported that only "60%-65% of our system" was "executing the recommended pricing architecture" for McDonald's menu of "10 items for under $3," that "call it a third of the system . . . did not execute against what we were guiding around," and that "with those folks that are not complying, as you would imagine, their business results are a lot softer than those who haven't complied. It starts with an education piece to show when you execute the program as designed, here's what that performance looks like compared to those who didn't."[59] He said that McDonald's business reviews with franchisees now include "a discussion around pricing and pricing execution," and explained that "[a]s we're now doing our business reviews with franchisees, which affects things like growth and eligibility from a franchisee standpoint, pricing and pricing non-compliance in certain cases is part of those conversations."[60] It was, he said, "kind of obvious what should happen out of that."[61] These statements show that McDonald's measures, franchisee by franchisee, whether each one prices as McDonald's recommends.

60. Franchisees confirm the coercion. In a survey of McDonald's franchisees reported in August 2026 by the National Owners Association, "[a]ll but 3% of franchisees in the survey said their control over pricing was either weakened or removed altogether," and about three-quarters said they had been "directly pressured" to change their prices.[62] In January 2026, the

[58] *McDonald's (MCD) Q2 2026 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Aug. 4, 2026), https://stockanalysis.com/stocks/mcd/transcripts/662377-q2-2026/ (last visited Nov. 16, 2026).
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] Jonathan Maze, *McDonald's Franchisees Send a Message With a 'Bill of Rights'*, RESTAURANT BUSINESS (Aug. 24, 2026), https://www.restaurantbusinessonline.com/financing/mcdonalds-franchisee-profitability-takes-hit-just-company-eyes-remodels (last visited Nov. 16, 2026).

same association adopted a "Franchisee Bill of Rights" demanding "the right to set prices without fear of recourse," free of "intimidation or diminished support from McDonald's."[63] When McDonald's announced its new standard, the association warned that it could push operators to price "below sustainable levels, particularly in high-cost markets" such as California.[64]

61. McDonald's thus penalizes franchisees who decline to follow the prices recommended by its common pricing algorithm, by threatening their eligibility for renewal and growth. Whatever the direction of a particular recommendation, McDonald's, not the independent franchisee, determines "the right pricing execution."[65] This is coercion within the meaning of Cal. Bus. & Prof. Code § 16729.

### I. Competing Restaurants Also Coordinate Directly

62. Competing McDonald's restaurants meet and make collective decisions through McDonald's national advertising cooperative ("OPNAD"), local cooperatives (including in California), McDonald's-endorsed franchisee organizations such as the National Franchisee Leadership Alliance, McDonald's Worldwide Convention, and Deloitte's regional meetings. McDonald's measures each franchisee's involvement with OPNAD and local cooperatives under its National Franchising Standards.

### J. Prices Rose Every Year Under the Pricing System

63. While the McDonald's Pricing System has operated, McDonald's U.S. prices rose every year: roughly 6% in 2021, roughly 10% in 2022, roughly 10% in 2023, with further increases in 2024, 2025, and 2026. McDonald's own May 29, 2024 Fact Sheet acknowledged that average

---

[63] Jonathan Maze, *McDonald's Franchisee Profitability Takes a Hit Just as the Company Eyes Remodels*, Restaurant Business (Jan. 27, 2026), https://www.restaurantbusinessonline.com/financing/mcdonalds-franchisees-send-message-bill-rights (last visited Nov. 16, 2026).
[64] Maze, *supra* note 57.
[65] *McDonald's (MCD) Q2 2026 Earnings Call Transcript & Audio*, *supra* note 58.

menu prices rose about 40% between 2019 to 2024, while the CPI for food away from home rose about 29% over the same period.66

64. McDonald's credited the Pricing System for making the price increases stick. Its CFO explained, "the data and analytical capability that comes from our third-party advisers who obviously make pricing recommendations to our business, including our franchisees," for allowing increases "in a way that has minimized the resistance from the customer."67 McDonald's FY2022 and FY2023 Forms 10-K credit "strategic menu price increases" as a driver of results.[68]

65. Prices keep rising even as McDonald's loses customers due to the price increases. McDonald's reported that 2024 U.S. comparable sales benefited from average check growth "partly offset by negative comparable guest counts,"69 and, according to Reuters, U.S. foot traffic declined year over year in every complete month from March through August 2026.70 Meanwhile, McDonald's U.S. operating income rose from about $4.07 billion in 2019 to about $5.81 billion in 2025. In a competitive market, falling customer counts lead to lower prices, not higher ones.

**K. California Prices Bear the Pricing Engine's Fingerprints**

66. California McDonald's restaurants charge substantially different prices for identical menu items, even when located within two miles of one another. Plaintiffs' counsel reviewed prices for 1,241 California McDonald's restaurants recorded on November 6 and 7, 2026.

---

[66] *U.S. Pricing: Myths vs. Facts*, *supra* note 4.
[67] *McDonald's (MCD) Q3 2023 Earnings Call Transcript & Audio*, *supra* note 35.
[68] McDonald's Corp., 2022 Annual Report (Form 10-K) (Feb. 24, 2023), https://www.sec.gov/Archives/edgar/data/63908/000006390823000012/mcd-20221231.htm; McDonald's Corp., 2023 Annual Report (Form 10-K) (Feb. 22, 2024), https://www.sec.gov/Archives/edgar/data/63908/000006390824000072/mcd-20231231.htm.
[69] McDonald's Corp., 2025 Annual Report (Form 10-K) (Feb. 25, 2025), https://www.sec.gov/Archives/edgar/data/63908/000006390825000012/mcd-20241231.htm.
[70] Cunningham, *supra* note 1.

Among 1,029 pairs of restaurants located within two miles of each other, 57 pairs, charged prices differing by at least 10% for the same six-item order, and 15 pairs differed by 15% or more.[71]

67. The price differences are substantial among California franchises. In East Los Angeles, two McDonald's restaurants approximately 1.5 miles apart charged $32.44 and $39.04 for the same six-item order, a difference of approximately 20%. In Chatsworth, two restaurants approximately 1.3 miles apart showed an18% difference for the same order. Similar disparities appeared in numerous California communities. Individual menu items exhibited even greater differences, including a 40% difference in the price of a ten-piece Chicken McNugget order between nearby Chatsworth restaurants.

68. These disparities are consistent with the operation of McDonald's centralized pricing engine. According to Reuters, three McDonald's franchisees reported that the engine has widened existing price differences for the same product between McDonald's restaurants, including from neighborhood to neighborhood within the same area.[72]

69. These gaps cannot be explained by operating costs. Restaurants a mile apart in the same city pay the same California fast-food minimum wage, buy from the same McDonald's-approved supply chain, and sell identical, standardized products. Nor can they be explained by competition: in a competitive market, a restaurant charging 20% more than an identical restaurant a mile away would lose customers to it and lower its prices in response. The gaps persist because both restaurants are priced by the same pricing engine, which sets each restaurant's prices to its

---

[71] *Drive Thru Index*, DRIVE THRU INDEX, https://drivethruindex.com (last visited Nov. 7, 2026) (California restaurant pages, prices checked Nov. 6-7, 2026). The app prices match the prices customers pay inside the restaurant. As part of counsel's investigation, the self-order kiosk menu at the McDonald's restaurant at 3805 E. Thousand Oaks Blvd., Westlake Village, California, was photographed in November 2026. Each of the 39 menu prices legible in those photographs matched, to the cent, the app pickup price recorded for that restaurant, for a combined $290.02 on both.

[72] Cunningham, *supra* note 1.

estimate of what that restaurant's customers will "tolerate" rather than to what a competing McDonald's nearby charges. The engine's "willingness to pay" pricing is possible only because the competing McDonald's restaurants nearby do not independently undercut one another.

70. The same pattern appears between restaurants in the same city and county. The McDonald's restaurants at 13925 Ventura Blvd. in Sherman Oaks and 12919 Victory Blvd. in North Hollywood are both in the City of Los Angeles, about 2.9 miles apart, and are subject to the same sales tax rate, the same Los Angeles minimum wage, and the same California fast-food minimum wage. On November 11, 2026, the same six-item order cost $35.74 at the Sherman Oaks restaurant and $38.84 at the North Hollywood restaurant, 8.7 percent more. Of the 422 menu items both restaurants sold that day, the North Hollywood restaurant charged more for 230, less for 100, and the same for 92. Its six-item order ranked 1,206th of 1,241 California McDonald's restaurants, from least to most expensive.73

71. McDonald's pricing patterns also differ from those observed at competing fast food chains. In Sacramento, 32 McDonald's restaurants charged between 6.89 and $7.89 for a Big Mac, while all 11 Burger King restaurants surveyed charged $7.19 for a Whopper. Similarly. Across 49 McDonald's restaurants in the San Fernando Valley, Plaintiffs' investigation identified 14 different Big Mac prices and 17 price levels for the same basket of menu items. By comparison, 11 of 12 Burger King restaurants charged $7.99 for a Whopper, and six of seven Wendy's restaurants charged $6.99 for a Dave's Single. Reuters reported that Wendy's and Burger King stated they did not use artificial intelligence in their pricing decisions.

---

[73] *McDonald's Menu Prices, 13925 Ventura Blvd, Sherman Oaks, CA*, DRIVE THRU INDEX (Nov. 11, 2026), https://drivethruindex.com/restaurants/us/ca/sherman-oaks/mcdonalds-1085; *McDonald's Menu Prices, 12919 Victory Blvd, North Hollywood, CA,* DRIVE THRU INDEX (Nov. 11, 2026), https://drivethruindex.com/restaurants/us/ca/north-hollywood/mcdonalds-741 (Distance is straight-line between U.S. Census Bureau geocoded addresses).

**L. Economic Research Supports the Anticompetitive Effects of Common Pricing Algorithms**

72. Economic research demonstrates that pricing algorithms can increase prices when competing sellers adopt common pricing technology. A 2024 study published in the Journal of Political Economy examining Germany's retail gasoline market found that adopting algorithmic pricing increased margins in competitive stations adopting the technology.[74] The researchers found that, in duopoly and triopoly markets, margins increased only when all competing stations adopted algorithmic pricing. These findings demonstrate how widespread use of pricing algorithms by competing sellers can reduce price competition and increase consumer prices.

73. Economic research also demonstrates that common pricing algorithms can increase prices even when they recommend different prices to different sellers. Joseph E. Harrington, Jr., an economist at the Wharton School of the University of Pennsylvania, modeled competing firms that buy their pricing algorithm from the same third-party developer.[75] He found that outsourcing pricing decisions to a common algorithm can make prices more responsive to differences in local demand while increasing industry profits and reducing consumer welfare. The effect is greater when competing products are more substitutable. Here, McDonald's restaurants sell substantially identical products, and the McDonald's Pricing System, implemented through Deloitte and Tiger Analytics, generates restaurant specific recommendations based in part on customer willingness to pay.

74. The economic research is consistent with the price-fixing mechanism here. McDonald's collects competitively sensitive information from competing restaurants, uses a

[74] *See* Stephanie Assad et al., *Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market*, 132 J. POL. ECON. 723 (2024).

[75] *See* Joseph E. Harrington, Jr., *The Effect of Outsourcing Pricing Algorithms on Market Competition*, 68 MGMT. SCI. 6355 (2022).

centralized pricing system to generate recommendations, and monitors franchisees' adherence to those recommendations. Unlike independent pricing decisions made without access to competitors' confidential information, this common system permits pricing recommendations to be informed by information supplied by competing restaurants. This arrangement reduces independent price competition and enables McDonald's and its franchisees to maintain prices above competitive levels.

### M. Defendants Concealed the Conspiracy

75. McDonald's repeatedly represented that franchisees independently set their own prices. In April 2024, Mr. Kempczinski told investors: "As you know, they control pricing."76 In May 2024, after a Darien, Connecticut franchisee's $18 Big Mac meal went viral, McDonald's USA's President published an open letter attributing price increases to costs and stating that franchisees "set menu prices for their restaurants."77 That Darien franchisee has since alleged that he charged that price "at Deloitte's recommendation," using the Deloitte service "that McDonald's recommends to its franchisees."78

76. McDonald's did not disclose how its pricing system worked, that it ran on pooled confidential data from competing restaurants, that McDonald's supplied rules (including the 30% Rule) that tied each restaurant's recommendation to its competitors' pricing, or that McDonald's recorded and punished deviations. Its annual reports do not disclose the McDonald's Pricing System's data inputs, its rules, or its monitoring of adherence.

77. Those facts first became public when Reuters reported them on September 29, 2026. Plaintiffs could not have discovered the conspiracy through reasonable diligence before

[76] *McDonald's (MCD) Q1 2024 Earnings Call Transcript & Audio*, STOCKANALYSIS.COM (Apr. 30, 2024), https://stockanalysis.com/stocks/mcd/transcripts/164947-q1-2024/ last visited Nov. 16, 2026).
[77] First Am. Compl., *Michell*, No. 1:24-cv-03442, ECF No. 55, ¶¶ 140-42.
[78] *Id.*, ¶¶ 139-42.

September 29, 2026. Any applicable limitations period was tolled until that date by Defendants' fraudulent concealment. In addition, each sale at a supracompetitive price is a new overt act that starts the limitations period anew.

**N. Authorities Have Raised Antitrust Concerns About Common Pricing Algorithms**

78. The United States Department of Justice has stated, in a filing in this District, that "any formula used to fix benchmark, component, recommended, or 'starting point' prices—even if end prices ultimately vary" can violate the Sherman Act, and that "sharing information through an algorithm provider can create the same anticompetitive effects as a direct exchange between competitors."79 Statement of Interest of the United States, *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795, ECF No. 380-1 (N.D. Ill. Mar. 26, 2025).

79. On November 2, 2026, Senator Elizabeth Warren and Representatives Becca Balint, Greg Casar, Jesús G. "Chuy" García, and Mary Gay Scanlon wrote to McDonald's President and Chief Executive Officer, Chris Kempczinski, about the McDonald's Pricing System: "[w]e are concerned that McDonald's may be using AI to squeeze consumers into paying higher prices, and that its AI pricing tools may facilitate collusion between franchisees who should be operating as competitors."80

80. The lawmakers identified the same features of the system alleged in this Complaint. It noted that McDonald's "has considerable leverage over franchise renewals and the opening of new locations," that McDonald's had told investors that "pricing non-compliance in certain cases is part of those conversations," and that franchisees "have a major financial incentive to comply with McDonald's 'recommendations' so as not to risk losing their franchise."81 It observed that

---

[79] Statement of Interest of the United States, *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795 (N.D. Ill. Mar. 26, 2025)., ECF No. 380-1.
[80] *Warren Letter*, *supra* note 7, at 1.
[81] *Id.* at 3.

the pricing portal's terms of service acknowledge that franchisees "may be competitors of each other," and stated that "[i]n the absence of AI-generated pricing recommendations, nearby stores would be forced to compete on price to attract customers."[82]

81. The lawmakers asked McDonald's to answer sixteen questions by November 16, 2026, including whether its pricing tools "use, directly or indirectly, pricing or transaction data from more than one McDonald's location when generating a pricing recommendation for an individual restaurant"; whether they "consider prices charged by nearby McDonald's restaurants"; whether a franchisee's decision not to follow the recommendations has "ever been considered in decisions concerning franchise renewal, approval of new locations, financial assistance, restaurant modernization, or other benefits or penalties for franchise owners"; why the portal warns users that franchisees "may be competitors of each other"; and "[w]hat antitrust review" McDonald's conducted before deploying the tools to franchisees.[83] One question concerned California directly: "[w]hat accounts for the 21% difference in Big Mac prices found between two McDonald's stores in Fresno, California as reported by Reuters?"[84]

82. California has also acted. Effective January 1, 2026, California amended the Cartwright Act to expressly prohibit the use or distribution of common pricing algorithms as part of an agreement to restrain competition, as well as the use of such algorithms to coerce competing sellers into adopting recommended prices.[85] The statute directly addresses the conduct alleged here.

[82] *Id.*
[83] *Id.* at 5.
[84] *Id.*
[85] Cal. Bus. & Prof. Code § 16729.

## EVIDENCE OF AGREEMENT

### A. Agreements and Coordinated Conduct

83. McDonald's franchise agreements and policies establish contractual relationships under which franchisees provide McDonald's with nonpublic transaction data, engage with its pricing consultants and tools and are subject to McDonald's pricing-related standards. McDonald's has acknowledged that it issues pricing directives in "pricing round[s]," and that franchisees show "very strong adherence" to them.[86] These arrangements support an inference that franchisees participated in a coordinated pricing arrangement and are not making wholly independent pricing decisions.

### B. Each Restaurant Knew It Was Part of a System-Wide Arrangement

84. Each McDonald's franchisee knew that competing restaurants participated in the same pricing system. McDonald's told investors that "[b]oth we and our franchisees" use the same adviser; every franchisee received the FDD disclosing the Base Pricing Engine fee; the portal's terms told every user that the other users "may be competitors of each other"; and the 30% Rule's recommendations themselves reflected what other restaurants had done.[87] Each restaurant also knew deviations were recorded and penalized.

85. On information and belief, each McDonald's franchisee understood that the prices it received from the McDonald's Pricing System were generated from nonpublic transaction data supplied by competing restaurants and understood that its competitors knew the same. Each restaurant therefore understood that its competitors were committed to the same plan of pricing to the engine's recommendations, and that they would not lower prices to take its customers.

[86] *McDonald's (MCD) Q3 2022 Earnings Call Transcript & Audio*, *supra* note 47.
[87] Cunningham, *supra* note 1.

86. McDonald's monitored franchisees' adherence to its pricing recommendations. In October 2022, its CFO reported "very strong adherence with our franchisees to our pricing recommendations"[88] and McDonald's reported in December 2023 that "adoption rates for our pricing strategy are high."[89] In August 2026, McDonald's CEO put the share of the system executing McDonald's "recommended pricing architecture" for its under-$3 menu at "60%-65%" and said that "pricing non-compliance" was part of franchisees' Business Reviews.90 On information and belief, a franchisee that deviates does so knowing that the deviation is recorded and may affect its eligibility to renew or grow.

**C. Parallel Conduct and Plus Factors**

87. Beginning in or around 2019, McDonald's and its franchisees abandoned independent pricing in favor of the McDonald's Pricing System, and then raised prices in parallel, in synchronized "pricing round[s]," across the menu, at a pace that jumped from roughly 2-3% in 2019 to roughly 10% in each of 2022 and 2023.

88. Numerous plus factors confirm that this parallel conduct resulted from agreement:

(a) *Exchange of competitively sensitive information.* Each restaurant supplied current, granular, nonpublic transaction data to a common hub that used the pooled data to generate its competitors' prices. No independent business would let its confidential data inform its rivals' prices unless it expected its rivals to do the same.

(b) *Actions against unilateral self-interest.* Each restaurant delegated its pricing toa common decision-maker that set its rivals' prices, submitted to

[88] *McDonald's (MCD) Q3 2022 Earnings Call Transcript & Audio*, *supra* note 47.
[89] *McDonald's (MCD) Transcript: Investor Update*, *supra* note 26.
[90] *McDonald's (MCD) Q2 2026 Earnings Call Transcript & Audio*, *supra* note 58.

monitoring of its adherence, and raised prices even as guest counts fell. Restaurants charging 15% to 20% more than an identical McDonald's a mile away did not lose their price premium, as they would in a competitive market.

(c) *Market structure.* Demand for McDonald's menu items is inelastic: McDonald's reported flow-through of "70% to 80%" of its price increases and said "there is no substitute for a Big Mac."[91] The franchisee who charged more than $18.00 for a Big Mac combo meal at Deloitte's recommendation alleges, on information and belief, that the price "caused no loss of sales."[92] The products are standardized under a uniform system, and every restaurant's prices are visible to McDonald's daily.

(d) *Opportunities to collude.* McDonald's franchisees regularly participated in common organizations and meetings, including OPNAD, local cooperatives, field votes, franchisee organizations, Deloitte's regional meetings, and the Worldwide Convention, providing them with additional opportunities to coordinate pricing.

**<u>RELEVANT MARKET AND MARKET POWER</u>**

89. Defendants engaged in a horizontal price-fixing conspiracy among competing McDonald's restaurants facilitated and enforced through the McDonald's Pricing System. Such conduct constitutes a per se violation of Section 1 of the Sherman Act and the Cartwright Act. Plaintiffs therefore need not establish a relevant market or market power to prevail on their per se claims. In the alternative, Plaintiffs allege the following relevant market and market power.

---

[91] *McDonald's (MCD) Transcript: Investor Update*, *supra* note 26.
[92] First Am. Compl., *Michell*, No. 1:24-cv-03442, ECF No. 55, ¶ 146.

90. McDonald's possessed substantial pricing power as shown directly by their ability to raise prices every year from 2019 through 2026, including roughly 10 percent per year in 2022 and 2023, while guest counts fell, and by the persistence of large price gaps between nearby McDonald's restaurants.

91. If a product market must be defined, it is the sale of meals and menu items to consumers by quick-service hamburger restaurants, such as McDonald's, Burger King, and Wendy's (the "QSR Hamburger Market"). These restaurants compete directly for consumers seeking convenient, relatively inexpensive, quickly prepared standardized hamburger meals. These restaurants differ from full-service restaurants, fast-casual restaurants, other categories of quick-service restaurants, or groceries. McDonald's reports that, across its top ten markets, it leads "by a wide margin in beef with more than 40% share in a $50 billion category."93

92. The relevant geographic market is the United States, because the McDonald's Pricing System generates recommendations centrally from Chicago for restaurants nationwide from nationally pooled data and McDonald's sets nationally advertised price points. In the alternative, the relevant geographic markets are the State of California and the Metropolitan Statistical Areas in which McDonald's restaurants are located, including the Los Angeles-Long Beach-Anaheim, San Francisco-Oakland-Fremont, Sacramento-Roseville-Folsom, and Fresno MSAs.

## ANTITRUST INJURY AND STANDING

93. Defendants' conspiracy eliminated independent price competition among McDonald's restaurants, the very competition McDonald's designed its system to create. The

[93] *McDonald's (MCD) Transcript: Investor Day 2026* , *supra* note 15.

McDonald's Pricing System raised prices at every restaurant that followed its recommendations, across the menu and throughout the Class Period.

94. Class members who purchased from McDonald's corporate-owned restaurants purchased directly from Defendants. Class members who purchased from franchised restaurants purchased directly from McDonald's franchisees, each of which is a co-conspirator that agreed with its horizontal competitors, through McDonald's as hub, to price through the McDonald's Pricing System. Class members are therefore the first non-conspirators in the chain of distribution and may recover the full overcharge from any member of the conspiracy.

95. Under the Cartwright Act, any person injured "by reason of anything forbidden or declared unlawful by this chapter" may sue "regardless of whether such injured person dealt directly or indirectly with the defendant." Cal. Bus. & Prof. Code § 16750(a). Every member of the California Subclass described below therefore has standing under the Cartwright Act, whether they bought from a McDonald's corporate-owned restaurant or a franchised restaurant.

96. California law governs the claims of the California Subclass. Each California Subclass member purchased in California, at prices generated for California restaurants, and California has the dominant interest in protecting California consumers from restraints of trade in California commerce. The choice-of-law clause in McDonald's franchise agreements binds McDonald's and its franchisees, not consumers.

97. Overcharges can be measured class-wide with common evidence, including the McDonald's Pricing System's recommendations and McDonald's restaurant-level transaction data, which McDonald's collects for every restaurant.

## CLASS ACTION ALLEGATIONS

98. Plaintiffs bring this action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following class and subclass:

*Nationwide Class:* All persons in the United States who purchased one or more menu items from a McDonald's restaurant in the United States, whether operated by McDonald's or by a franchisee, from January 1, 2019 until the effects of Defendants' conduct cease (the "Class Period").

*California Subclass:* All members of the Nationwide Class who purchased one or more menu items from a McDonald's restaurant in California, whether operated by McDonald's or by a franchisee, during the Class Period.

99. The Nationwide Class and the California Subclass are together the "Classes." Counts IV and V seek relief on behalf of the California Subclass for purchases made on or after January 1, 2026, the effective date of Cal. Bus. & Prof. Code § 16729. Excluded are Defendants, all McDonald's franchisees, their officers, directors, and employees; and any judicial officer assigned to this case and that officer's immediate family and staff. Plaintiffs reserve the right to modify these definitions.

100. *Numerosity*. The Nationwide Class and the California Subclass each contain millions of members. Joinder is impracticable.

101. *Commonality and predominance*. Common questions predominate, including: (a) whether Defendants and their co-conspirators agreed to fix, raise, maintain, or stabilize menu prices through the McDonald's Pricing System; (b) whether the McDonald's Pricing System is a "common pricing algorithm" under Cal. Bus. & Prof. Code § 16729; (c) whether Defendants used or distributed it as part of a conspiracy, and whether McDonald's coerced franchisees to adopt its

prices; (d) whether Defendants exchanged competitively sensitive information through it; (e) whether the conduct is unlawful per se or under the rule of reason; (f) whether the conduct raised prices and the measure of class-wide damages; and (g) appropriate injunctive relief.

102. *Typicality*. Plaintiffs' claims arise from the same conduct and legal theories as those of all members of the Classes.

103. *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel experienced in antitrust and consumer class actions.

104. *Superiority*. A class action is superior because individual damages are small relative to the cost of litigating complex antitrust claims.

105. *Injunctive relief*. Defendants have acted on grounds generally applicable to the Classes, making injunctive relief appropriate for each of the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1: Price Fixing**
**(Brought Under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26)**
**(On Behalf of All Plaintiffs and the Nationwide Class)**
**(Against All Defendants)**

106. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

107. Beginning no later than 2019 and continuing to the present, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to fix, raise, maintain, and stabilize the prices of menu items sold at McDonald's restaurants in the United States.

108. The conspiracy consisted of an agreement among competing McDonald's restaurants, company-owned and franchised, organized and enforced by McDonald's and furthered by Deloitte, to delegate pricing to the McDonald's Pricing System, to supply it with their nonpublic

transaction data, to receive price recommendations generated from competitors' pooled data, to adhere to those recommendations, and to adopt system-wide price points.

109. The conspiracy is a horizontal agreement among competitors to fix prices and is unlawful per se. In the alternative, it is unlawful under a quick-look analysis, because its anticompetitive effect on prices is obvious, or under the rule of reason, because it had substantial anticompetitive effects, including higher prices and the elimination of independent price competition, and any procompetitive justification could be achieved through substantially less restrictive means, such as pricing tools that do not pool competitors' confidential data, do not condition one restaurant's price on its competitors' prices, and are not tied to franchise renewal.

110. As a direct and proximate result, Plaintiffs and Nationwide Class members paid supracompetitive prices and were injured in their business or property. Under Section 4 of the Clayton Act, 15 U.S.C. § 15, they are entitled to treble damages, costs, and reasonable attorneys' fees. Under Section 16 of the Clayton Act, 15 U.S.C. § 26, they are entitled to an injunction against the continuing violation.

**COUNT II**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1: Unlawful Information Exchange**
**(Brought Under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26)**
**(On Behalf of All Plaintiffs and the Nationwide Class)**
**(Against All Defendants)**

111. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

112. Defendants and their co-conspirators agreed to exchange, through the McDonald's Pricing System, current, granular, nonpublic, competitively sensitive information, including transaction-level sales, prices, and product mix and monthly restaurant-level profit-and-loss statements, and to use that information to generate each competing restaurant's prices.

113. The exchange was continuous and centralized, took place among competitors in a market of standardized products and inelastic demand, and was enforced through monitoring and renewal decisions. It had the actual effect of reducing price competition and raising prices, and it served no legitimate procompetitive purpose that could not have been achieved through less restrictive means. It is unlawful under the rule of reason.

114. As a direct and proximate result, Plaintiffs and Nationwide Class members paid supracompetitive prices and are entitled to treble damages, costs, and attorneys' fees under 15 U.S.C. § 15 and injunctive relief under 15 U.S.C. § 26.

**COUNT III**
**Violation of the Cartwright Act: Price Fixing**
**(Cal. Bus. & Prof. Code §§ 16720, 16726, 16750)**
**(On Behalf of California Plaintiffs and the California Subclass)**
**(Against All Defendants)**

115. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

116. Beginning no later than 2019 and continuing to the present, Defendants and their co-conspirators entered into and carried out a continuing trust, combination, and conspiracy in unreasonable restraint of trade and commerce, in violation of Cal. Bus. & Prof. Code §§ 16720 and 16726, to fix, raise, maintain, and stabilize the prices of McDonald's menu items sold in California, by the means alleged above.

117. Substantial parts of the conspiracy were carried out in and directed at California: Defendants generated and delivered recommended prices for California restaurants, collected California restaurants' transaction data, enforced adherence against California franchisees, and sold menu items at fixed prices to Plaintiffs and the California Subclass in California.

118. The combination is a horizontal price-fixing agreement and is unlawful per se under the Cartwright Act. In the alternative, it is an unreasonable restraint of trade under the rule of reason.

119. Plaintiffs' allegations make the existence of a contract, combination, or conspiracy plausible, which is all the Cartwright Act requires; a Cartwright Act complaint need not allege facts tending to exclude the possibility of independent action. Cal. Bus. & Prof. Code § 16756.1.

120. As a direct and proximate result, Plaintiffs and California Subclass members, whether they purchased directly or indirectly from Defendants, paid supracompetitive prices and were injured in their business or property. Under Cal. Bus. & Prof. Code § 16750(a), they are entitled to treble damages, interest, reasonable attorneys' fees and costs, and injunctive relief.

**COUNT IV**
**Violation of the Cartwright Act: Use and Distribution of a Common Pricing Algorithm**
**(Cal. Bus. & Prof. Code §§ 16729, 16750)**
**(On Behalf of California Plaintiffs and the California Subclass, for Purchases on or After January 1, 2026)**
**(Against All Defendants)**

121. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

*122.* Since January 1, 2026, it has been unlawful "for a person to use or distribute a common pricing algorithm as part of a contract, combination in the form of a trust, or conspiracy to restrain trade or commerce in violation of this chapter." Cal. Bus. & Prof. Code § 16729. A "common pricing algorithm" is "any methodology, including a computer, software, or other technology, used by two or more persons, that uses competitor data to recommend, align, stabilize, set, or otherwise influence a price or commercial term." *Id.*

123. The McDonald's Pricing System is a common pricing algorithm. It is software used by McDonald's, its McDonald's corporate-owned restaurants, and thousands of franchisees, each

a competitor of the others, and it uses competitor data, including competing restaurants' transaction data, menu prices of nearby Wendy's and Burger King restaurants, and the 30% Rule's measure of competitors' price increases, to recommend, align, stabilize, set, and influence menu prices.

124. McDonald's and Deloitte distribute the McDonald's Pricing System to competing restaurants, and McDonald's uses it to price its McDonald's corporate-owned restaurants, as part of the contract, combination, and conspiracy alleged in Count III.

125. As a direct and proximate result, Plaintiffs and members of the California Subclass, for purchases made on or after January 1, 2026, paid supracompetitive prices and are entitled to treble damages, interest, reasonable attorneys' fees and costs, and injunctive relief under Cal. Bus. & Prof. Code § 16750(a).

**COUNT V**
**Violation of the Cartwright Act: Coercion to Adopt Algorithm-Recommended Prices**
**(Cal. Bus. & Prof. Code §§ 16729, 16750)**
**(On Behalf of California Plaintiffs and the California Subclass, for Purchases on or After January 1, 2026)**
**(Against McDonald's Corporation and McDonald's USA, LLC)**

126. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

127. Since January 1, 2026, it has been unlawful "for a person to use or distribute a common pricing algorithm if the person coerces another person to set or adopt a recommended price or commercial term recommended by the common pricing algorithm for the same or similar products or services in the jurisdiction of this state." Cal. Bus. & Prof. Code § 16729. This prohibition does not require proof of an agreement.

128. McDonald's uses and distributes the McDonald's Pricing System and coerces franchisees, including California franchisees, to adopt its prices. Effective January 1, 2026, McDonald's requires franchisees to be "constructively engaging with McDonald's approved

Pricing Consultant and Tools"; it records each franchisee's deviations from the pricing; its officers call franchisees who stray; and it makes "pricing non-compliance" part of the Business Reviews that determine franchisees' "growth and eligibility," including whether they receive a new franchise term.[94]

129. As a direct and proximate result, California franchisees adopted algorithm-generated prices they would not otherwise have charged, and Plaintiffs and members of the California Subclass, for purchases made on or after January 1, 2026, paid supracompetitive prices. They are entitled to treble damages, interest, reasonable attorneys' fees and costs, and injunctive relief under Cal. Bus. & Prof. Code § 16750(a).

**COUNT VI**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**
**(On Behalf of Plaintiffs and the California Subclass)**
**(Against All Defendants)**

130. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

131. Defendants' conduct is unlawful under the UCL because it violates the Cartwright Act, including § 16729, and Section 1 of the Sherman Act.

132. Defendants' conduct is unfair under the UCL because it violates the policy and spirit of the antitrust laws and significantly threatens and harms competition, whether or not it is found to violate those laws, and its harm to California consumers far outweighs any utility.

133. Plaintiffs lost money or property as a result of Defendants' conduct by paying supracompetitive prices for McDonald's menu items in California.

[94] Cunningham, *supra* note 1.

134. Plaintiffs and the California Subclass seek restitution of the overcharges paid to Defendants and an injunction prohibiting the conduct alleged. Plaintiffs plead this equitable claim in the alternative to the damages claims, to the extent legal remedies are inadequate, including because injunctive relief is necessary to stop ongoing overcharges and because the UCL's limitations period and elements differ from those of the Cartwright Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, respectfully request that the Court:

(a) Certify the Nationwide Class and the California Subclass under Rule 23, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Defendants' conduct violates Section 1 of the Sherman Act, the Cartwright Act, including Cal. Bus. & Prof. Code § 16729, and the UCL;

(c) Award Plaintiffs and the Classes damages, trebled under 15 U.S.C. § 15 and Cal. Bus. & Prof. Code § 16750(a), in an amount to be determined at trial;

(d) Award restitution under the UCL;

(e) Under 15 U.S.C. § 26 and Cal. Bus. & Prof. Code §§ 16750 and 17203, permanently enjoin Defendants from (i) using one restaurant's nonpublic data to generate pricing recommendations for competing restaurants; (ii) using or distributing any common pricing algorithm in violation of Cal. Bus. & Prof. Code § 16729; (iii) monitoring franchisees' adherence to pricing recommendations, or considering pricing compliance in Business Reviews, renewal, or growth decisions; and (iv) entering into any similar arrangement;

(f) Award pre- and post-judgment interest;

(g) Award costs of suit and reasonable attorneys' fees under 15 U.S.C. §§ 15 and 26, Cal. Bus. & Prof. Code § 16750(a), and Cal. Civ. Proc. Code § 1021.5; and

(h) Grant such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Under Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 17, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

By: */s/ Tyler A. Litke*
Tyler A. Litke (6330041)
Ellen T. Noteware (82711)
Mark S. Reich*
Eleanor C. Davis*
33 Whitehall Street, 27th Floor
New York, New York 10004
Telephone: (212) 363-7500
Email: tlitke@zlk.com
Email: enoteware@zlk.com
Email: mreich@zlk.com
Email: edavis@zlk.com

*Attorneys for Plaintiffs and the Proposed Class and Subclass*